1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                              No. 1:15-cr-10129-WGY-1

4

5     UNITED STATES OF AMERICA

6

7     vs.

8

9     JARROD PLOMARITIS

10

11                         * * * * * * * * *

12

13                      For Hearing Before:
                        Judge William G. Young

14

15              Change of Plea and Sentencing

16

17                      United States District Court
                        District of Massachusetts (Boston.)
                        One Courthouse Way
18                      Boston, Massachusetts 02210
                        Monday, February 1, 2016

19

20                         * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                        Official Court Reporter
23                   United States District Court
            One Courthouse Way, Room 5500, Boston, MA 02210
24                    bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   KENNETH G. SHINE, ESQ.
         United States Attorney's Office
 4       One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
 5       (617) 748-3686
         E-mail: Kenneth.shine@usdoj.gov
 6       For the United States of America

 7
     JESSICA P. THRALL, ESQ.
 8       Federal Public Defender's Office
         51 Sleeper Street, 5th Floor
 9       Boston, Massachusetts 02110
         (617) 223-8061
10       Email: Jessica_thrall@fd.org
         For the defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       P R O C E E D I N G S

2       (Beginning, 2:05 p.m.)

3       THE CLERK:  Criminal Matter 15-10129, the United

4  States of America versus Jarrod Plomaritis.

5       THE COURT:  Good afternoon.  Would counsel

6  identify themselves.

7       MR. SHINE:  Your Honor, good afternoon, it's

8  Kenneth Shine appearing on behalf of the United States.

9       MS. THRALL:  Good afternoon, your Honor, Jessica

10  Thrall for Mr. Plomaritis who is present with me at

11  counsel table.

12       THE COURT:  Do I understand that Mr. Plomaritis

13  desires to tender a plea of guilty?

14       MS. THRALL:  Yes.

15       THE COURT:  He may come forward to be inquired of.

16       MS. THRALL:  Thank you.

17       (THE DEFENDANT, sworn.)

18       THE COURT:  Would you state your full name.

19       THE DEFENDANT:  Jarrod Michael Plomaritis.

20       THE COURT:  And you say -- "Plomaritis," is that

21  how you --

22       THE DEFENDANT:  Yes.

23       THE COURT:  Mr. Plomaritis, my name is Bill Young,

24  I'm the judge who presides in this session of the court.

25  When I asked, your attorney says that you're prepared to

1    plead guilty to the charges against you.  Before I can

2    allow you to plead guilty, and it is up to me, I have to

3    find out a variety of things.

4         First, I have to find out that you know what

5    you're doing, I have to find out that you know what

6    you're giving up because you give up things that are

7    terribly important to you if you plead guilty.  I have

8    to find out that you know what you're going to be

9    letting yourself in for, what might happen to you if you

10   plead guilty.  I have to find out that you want to plead

11   guilty, not that you're happy about pleading guilty, but

12   all things considered -- and you're in the driver's seat

13   now and you may talk with your attorney, you may talk

14   with your family, anyone you take advice from, but

15   you're in the driver's seat.  And you don't have to

16   plead guilty, if you want to stop here, you just tell me

17   you want to stop and that's fine.  I have to be sure

18   that you're pleading guilty voluntarily.

19        Do you understand that?

20        THE DEFENDANT:  Yes, I do.

21        THE COURT:  Now, if you decide not to plead

22   guilty, understand that that doesn't make me angry, it

23   doesn't mess up my afternoon, that if we go to trial and

24   you're found guilty, I'll impose a sentence on you, but

25   it will never be greater -- I would never increase it

1  because you went to trial.

2      You understand that?

3      THE DEFENDANT:  Yes.

4      THE COURT:  All right.  And lastly, I have to find

5  out that the government has enough evidence that if we

6  go to trial in this case you could be found guilty of

7  these charges.

8      Now, to find these things out, I'm going to ask

9  you questions.  The -- if you don't understand something

10  I'm asking you, stop me, because I have to ask it in a

11  way that you'll understand.  And at the end we'll ask

12  the government what evidence it has and I'll ask you

13  whether that evidence is true.

14      So let's start with the "Do you know what you're

15  doing?"

16      THE DEFENDANT:  I do.

17      THE COURT:  Well, you say so, but I've got to be

18  sure you do.

19      How old are you, sir?

20      THE DEFENDANT:  28.

21      THE COURT:  How far have you gone in school?

22      THE DEFENDANT:  I completed one semester in

23  college.

24      THE COURT:  Have you ever been treated for a

25  mental condition of any sort?

1          THE DEFENDANT:  I have.

2          THE COURT:  And can you tell me what the diagnosis

3     was?

4          THE DEFENDANT:  I'm bipolar and PTSD.

5          THE COURT:  All right.  Are you being treated for

6     that now?

7          THE DEFENDANT:  I am not.

8          THE COURT:  When last were you treated for those

9     conditions?

10          THE DEFENDANT:  I couldn't give you an accurate

11     date.

12          THE COURT:  All right.  How were you treated, did

13     you take medication?

14          THE DEFENDANT:  Yes, a combination of medication

15     and therapy.

16          THE COURT:  All right.  But at some time that

17     ended, is that right, that treatment?

18          THE DEFENDANT:  Yes, it did.

19          THE COURT:  You're not having any treatment today?

20          THE DEFENDANT:  I am not.

21          THE COURT:  Are you taking any medication today?

22          THE DEFENDANT:  I am not.

23          THE COURT:  How do you feel today?

24          THE DEFENDANT:  It's tough without the medication

25     and therapy.

1          THE COURT:  If you don't mind, what does that

2     mean?

3          THE DEFENDANT:  Um, I have ups and downs.

4          THE COURT:  And how are you feeling today?

5          THE DEFENDANT:  Um, manageable.

6          THE COURT:  All right.  I just want to see that

7     you --

8          Do you think you can make your own decisions --

9     your own decisions?

10          THE DEFENDANT:  Of course.

11          THE COURT:  You understand Ms. Thrall is your

12     attorney and she's 100 percent in your corner here,

13     you're clear on that?

14          THE DEFENDANT:  I am.

15          THE COURT:  And you understand that Mr. Shine he

16     represents the government.  Now his job is to advocate

17     for the government, he has, um -- he's not just against

18     you, his job is to reach out for justice, but he's not

19     on your side here, he's representing the government, you

20     understand that?

21          THE DEFENDANT:  I do.

22          THE COURT:  And do you understand what my role is

23     here?

24          THE DEFENDANT:  I do.

25          THE COURT:  What do you think it is?

1          THE DEFENDANT:  To make a judgment.

2          THE COURT:  Well, I have to make a judgment about

3     those things I'm going to be asking you about, yes, and

4     in part I have to make a judgment about whether you know

5     what you're doing and you're able to tell me to stop

6     asking the questions if you decide you don't want to go

7     on.

8          THE DEFENDANT:  Uh-huh.

9          THE COURT:  Now, do you think you're able to do

10    that?

11         THE DEFENDANT:  I do.

12         THE COURT:  I asked you, I think, but you're not

13    taking any medication today?

14         THE DEFENDANT:  I am not.

15         THE COURT:  Are you under the influence of

16    alcohol?

17         THE DEFENDANT:  No.

18         THE COURT:  Under the influence of any drug?

19         THE DEFENDANT:  No.

20         THE COURT:  Do you know what you're charged with?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Tell me.

23         THE DEFENDANT:  Three counts of bank robbery.

24         THE COURT:  It isn't a test, but that's exactly

25    right.  So let's go over what the government has to

1  prove here.

2       The government has to prove -- there's three

3  counts, they're the same charges, the three counts,

4  which means three different instances of bank robbery

5  they're going to try to prove against you.  What they

6  have to prove -- and each one, I will tell the jury if

7  we go to trial, the jury has to keep separate, and in

8  each one the government is going to have to prove that

9  you robbed.

10       Now, "robbed" means to take money for property by

11  means of putting someone in fear, um, by threatening

12  them in some way.  People can get money from banks

13  improperly by embezzling it, by some means of fraud, but

14  that's not what you're charged with, you're charged with

15  getting some bank employee to turn over to you, to pass

16  over to you money or property by scaring them, by making

17  them afraid to resist, and in fact that's the reason

18  that they turn over the money or property to you.

19  That's robbery.

20       Now, this is bank robbery.  So "bank robbery"

21  means the government has to prove that it was a bank, it

22  was a savings or lending institution, a place where

23  deposits may be made, um, where money transactions take

24  place, and what brings us into the courts of the United

25  States is they're going to have to prove that the bank's

1    deposits either were insured by the Federal Deposit

2    Insurance Corporation or were -- that it was a

3    nationally-chartered bank, a bank chartered by the

4    United States.  Now, they don't have to prove that you

5    knew it, but they have to prove that it was such a bank.

6         Now, do you understand that on each of these three

7    separate alleged bank robberies they've got to prove

8    those things before you can be found guilty of any one

9    of these charges, do you understand that?

10        THE DEFENDANT:  I do.

11        THE COURT:  In addition here --

12        (Pause.)

13        THE COURT:  I just want to be clear.

14        Mr. Shine, because I have a presentence report, I

15   don't see any enhancements.  The one enhancement,

16   because it was the property of a financial institution,

17   that's an element of the crime, so I've gone over that.

18        Are there any other enhancements?

19        MR. SHINE:  There are no other enhancements, your

20   Honor.

21        THE COURT:  Thank you.

22        Now, we keep talking about the government has to

23   prove things, but let's talk about your rights.  Your

24   rights.

25        You have the right to a fair and an impartial

1    trial before a jury.  Now, through Ms. Thrall you'll get

2    some say on who sits on that jury, they'll decide

3    whether the government has proven the case beyond a

4    reasonable doubt, not me, it's up to them.  At the trial

5    you'll be right here in the courtroom, you can confront

6    the witnesses against you, that means you can look them

7    right in the eye -- because you're sitting right here in

8    the courtroom, but more than that you can have

9    Ms. Thrall challenge their testimony, she can cross-

10   examine them, she can call witnesses on your own behalf,

11   you can testify on your own behalf, but you don't have

12   to.  But that's one of your rights and that implicates

13   another right.  You don't have to do anything.  The

14   government made these charges, the government's got to

15   prove these charges beyond a reasonable doubt.  You

16   don't have to testify, you don't have to call witnesses

17   or make arguments, you can just be silent.  To the

18   extent you're silent, I say to the jury you are an

19   innocent man.  Those are the words.  I will tell them

20   you start out as an innocent man.  I'm not giving you

21   anything when I tell you these things, these things are

22   your rights under the Constitution.

23       Do you understand you have these rights?

24       THE DEFENDANT:  I do.

25       THE COURT:  Now, if you plead guilty here, you're

1  giving all these rights away, there's never going to be

2  a trial, we're never going to get to see what evidence

3  there is, the closest we'll come is I'll ask Mr. Shine

4  briefly to tell me what he hopes he can prove, he'll

5  tell me, and I'll ask you whether that's true, and then

6  if you say it is, that's what I'm basing things on,

7  that's what I'll take as having established your guilt.

8  That's as close to a trial as we'll come.  You don't get

9  to see the witnesses, you don't get to have your lawyer

10  cross-examine them or make arguments.  And once I

11  sentence you, then your right to be silent about these

12  crimes, that's gone, and if -- and it's not charged

13  here, but if you were involved with someone else and the

14  like on these crimes, not on some other crimes, but on

15  these crimes, I mean you would have to testify, your

16  right to silence is gone once you're guilty.

17          Do you understand?

18          THE DEFENDANT:  I do.

19          THE COURT:  And lastly, if you plead guilty, then

20  you're guilty, there's no taking it back or starting

21  over, and you're guilty in my eyes and all that remains

22  is what sentence I'll impose upon you.

23          You're clear on that?

24          THE DEFENDANT:  I am.

25          THE COURT:  All right.

1          Now, the way this is set up and I have, at least,

2     some question about it is that we would move on to

3     sentencing today.

4          Is there a plea agreement here?  I don't have it

5     in front of me.

6          MS. THRALL:  No.

7          THE COURT:  So this is a straight-up plea?

8          MS. THRALL:  Yes.

9          THE COURT:  But I have a pre-plea presentence

10    report?

11         MS. THRALL:  That's correct, your Honor.

12         THE COURT:  Well, we'll talk about that if he

13    pleads guilty.

14         Mr. Plomaritis, in your case I've been given a

15    pre-plea presentence report, and I've had a chance to

16    look it over so I know various things about you, and you

17    understand that your attorney is asking that if you

18    plead guilty, I impose the sentence right now and we go

19    from there.

20         Do you understand that?

21         THE DEFENDANT:  I do.

22         THE COURT:  Now, Mr. Shine, I'm going to talk to

23    him because there's no plea agreement, you don't have a

24    deal with the government, so I'm going to -- if I went

25    for this I'm going to have to make some judgments, and

1   before you plead guilty, while you're still innocent, I

2   need to know the following.

3       I'm going to ask Mr. Shine to tell me the highest

4   I could sentence if there was no discount for your

5   sparing the government the burden and expense of a

6   trial, I'm going to ask the top of the applicable

7   guideline, then I'm going to ask him what the guideline

8   range is if you plead guilty and the government doesn't

9   have the burden and expense of having to put you through

10  a trial, and then we'll talk about those things.

11      Mr. Shine.

12      MR. SHINE:  Your Honor, the statutory maximum is a

13  period of 20 years imprisonment, and under your view of

14  what is constitutionally mandated, the highest number is

15  105 months, and with full acceptance of responsibility

16  the sentencing range is a low of 63 to 78 months.

17      THE COURT:  Thank you.

18      Now -- and Mr. Shine knew I was going to ask him

19  this question.

20      He tells me that if you plead guilty here, based

21  upon this presentence report, as I interpret the

22  Constitution, I can send you to prison for 105 months.

23  Do you understand that?

24      THE DEFENDANT:  I do.

25      THE COURT:  And it will be recommended -- well,

1   we'll see what people are going to recommend, but the

2   sentencing commission, which gives me a guideline for

3   all sentences -- all crimes of this type, they recommend

4   to me that I send you to prison for not less than 63

5   months nor more than 78 months.  Now that's 5 years, 3

6   months up to 6 years, 6 months.

7          Do you understand that?

8          THE DEFENDANT:  I do.

9          THE COURT:  Now, there is no plea agreement here

10  so, um, Mr. Shine, is the government -- we dealt with a

11  situation that is not the same as this, but does the

12  government object to my going ahead and sentencing

13  today?

14         MR. SHINE:  No, your Honor, I think it would be

15  prudent, the pre-plea PSR has been done a number of

16  months ago and I've read it and I'm fully comfortable

17  with going forward.

18         THE COURT:  All right, so before he's pled then,

19  why don't you -- just bottom line, what's your

20  recommendation?

21         MR. SHINE:  My recommendation is going to be the

22  low end of the advisory guideline of 63 months, a period

23  of 3 years of supervised release, restitution in the

24  amount of $5,162, and a $300 special assessment.

25         THE COURT:  Did you hear what Mr. Shine said?

1          THE DEFENDANT:  I did.

2          THE COURT:  Now, in essence, now that he's said

3     that, even though you don't have a plea agreement, if

4     you go ahead and plead guilty, you can hold him to that.

5     Let's be very clear.  He's going to recommend that you

6     get 63 months in prison.  And usually under the law I

7     have to give you credit, I see that we've got you in

8     custody, but I have to give you credit for the time

9     you've been in custody, but that's a sentence of 5 years

10    and 3 months.

11         Do you understand that?

12         THE DEFENDANT:  I do.

13         THE COURT:  And that would be followed by 3 years

14    of supervised release, are you clear on that?  It's like

15    probation, but there's specific requirements, and if you

16    were to violate those requirements I could put you back

17    in prison.

18         Are you clear?

19         THE DEFENDANT:  I am.

20         THE COURT:  And then restitution in the amount of

21    $5,000 and some-odd funds that was stolen from the banks

22    plus I have to impose a $300 special assessment.

23         You understand that that's going to be his

24    recommendation here?

25         THE DEFENDANT:  I do.

1          THE COURT:  Now, other than what he just told me,

2    has anyone promised you anything to get you to plead

3    guilty?

4          THE DEFENDANT:  No.

5          THE COURT:  Has anyone threatened you with

6    anything to get you to plead guilty?

7          THE DEFENDANT:  No.

8          THE COURT:  Are you covering up for someone else

9    by pleading guilty yourself?

10         THE DEFENDANT:  No.

11         THE COURT:  Are you -- excuse me.

12         Do you know that if you're not a citizen of the

13   United States, that conviction of this crime -- these

14   crimes, there are three -- and also there's a forfeiture

15   allegation and that means to the extent that they've got

16   the fruits or instrumentalities of the crimes, those

17   things are forfeited to the government.

18         Do you understand that?

19         THE DEFENDANT:  I do.

20         THE COURT:  Now, if you're not a citizen, pleading

21   guilty here can have the consequence of your being

22   deported, denied admission under the laws of the United

23   States, denied naturalization under the laws of the

24   United States.

25         Do you understand?

1      THE DEFENDANT:  I do.

2      THE COURT:  Have you had enough time to talk all

3  this over with Ms. Thrall?

4      THE DEFENDANT:  I have.

5      THE COURT:  Do you think she's been a good

6  attorney for you, gotten for you those things which are

7  your rights under the law?

8      THE DEFENDANT:  I do.

9      THE COURT:  Are you satisfied with her

10  representation of you?

11      THE DEFENDANT:  Always.

12      THE COURT:  Well, it sounds like you have

13  confidence in her.

14      THE DEFENDANT:  I do.

15      THE COURT:  You really do?

16      THE DEFENDANT:  I do.

17      THE COURT:  Do you still want to plead guilty?

18      THE DEFENDANT:  I do.

19      THE COURT:  Why?

20      THE DEFENDANT:  Because I'm guilty.

21      THE COURT:  Very well.

22      Now I'm going to ask Mr. Shine briefly, just

23  touching on those things that he has to prove, to tell

24  me as to each of the three events what he hopes he could

25  prove to a jury and I'm going to ask you then if you

1  understand it and if it's true.

2       Mr. Shine.

3       MR. SHINE:  Your Honor, if this case were to go to

4  trial the government's evidence would show the

5  following.

6       Wednesday, January 21st, 2015, at approximately

7  1:00 p.m., a white male entered the Eastern Bank -- the

8  Eastern Bank is a bank which deposits are insured by the

9  Federal Deposit Insurance Agency, on West Broadway in

10  South Boston, the individual approached a teller and

11  handed her a note.  The teller recalled what the note

12  said, in essence, "Give me all your money, no die-packs,

13  no tracking money, be quiet, be fast."  The teller

14  handed the robber $2,810 in United States currency, the

15  robber took the currency, retrieved the demand note, and

16  exited the bank.  The teller stated that the robber was

17  a clean-shaven white male, 5'8 to 5'10, wearing a black

18  Boston Bruins hat, a black jacket, gloves, Khaki pants

19  and tan construction boots.  The bank surveillance tapes

20  were functioning and operating on the day of the

21  robbery.  The cameras captured images of the robber as

22  he entered the bank, robbed the teller, and left the

23  bank.  And following the robbery the bank posted the

24  photographs of the robber on a website that's called

25  "Mass Most Wanted," additionally the photographs were

1  forwarded to the Boston Regional Intelligence Center.

2      On February 17th, 2015, at approximately 2:15, a

3  white male entered the Santander Bank located at 475

4  West Broadway in South Boston, at that time the deposits

5  at the Santander Bank were insured by the Federal

6  Deposit Insurance Corporation.  The individual

7  approached a teller, handed the teller a note, and the

8  teller recalled the note said the following, "Give me

9  all your cash in the drawers, no die."  The teller

10  handed the robber $1,715 in United States currency, the

11  robber took the currency, retrieved the demand note, and

12  exited the bank.  The teller who had interacted with the

13  robber stated the robber was a white male, late 20s,

14  wearing a black and white baseball hat, a black coat, a

15  grey shirt, black gloves, sneakers and jeans.  He also

16  stated that during the robbery the robber was talking on

17  his cell phone.  Now the bank surveillance cameras were

18  functioning and operating on the day of this robbery and

19  they captured images of the individual as he robbed the

20  teller and exited the bank.

21      Boston police and the FBI Violent Crime Task Force

22  responded to the bank and reviewed the bank surveillance

23  video.  A Boston police officer, after reviewing this

24  video, stated that she knew the robber to be the

25  defendant, Jarrod Plomaritis of South Boston, she stated

that she had interacted with him a few days earlier, had

recognized him from the surveillance tapes, the fact

that he was wearing the same clothing in the pictures.

Later that day the FBI's Violent Crime Task Force

prepared a photo array which included Mr. Plomaritis's

photograph.  The teller who interacted with

Mr. Plomaritis positively identified him as the

individual who robbed the Santander Bank.  These photos

were also posted on the Mass Most Wanted website and

were forwarded to the Boston branch.

A few days later, February 23rd, 2015, at

approximately 9:30 a.m., the white male entered the

Eastern Bank -- this is the same bank that was robbed a

few days earlier, February 17th, and deposits of this

bank are insured by the Federal Deposit Insurance

Agency.  The male approached a teller, handed her a

note, the note -- the teller recalled that this note

stated "Give me the money."  The robber then stated,

"Read the note," he took the note back from her, the

teller handed the robber $637 in U.S. currency, and he

exited the bank.  The teller who interacted with the

robber stated the robber was a white male, 5'10 wearing

a black hat with a green shamrock on the front, a black

jacket, blue jeans, and construction boots.  Video

surveillance cameras were functioning and operational

1    the date of this robbery and they captured images of the

2    individual as he entered the bank, robbed the teller,

3    and then left the bank.

4          On February 25th, members of the FBI Violent Crime

5    Task Force prepared another photo array relative to this

6    robbery, the teller in that robbery positively

7    identified Mr. Plomaritis as the individual who had

8    robbed the bank.  With this in mind the FBI ran

9    Mr. Plomaritis's name and determined that he was

10   currently on probation.

11         On February 27th, they met with Mr. Plomaritis's

12   state probation officer.  The probation officer stated

13   that she recently reviewed the photograph regarding the

14   robbery of Eastern Bank and stated that the person in

15   all three of the robberies was an individual she knew as

16   Jarrod Plomaritis.

17         On March 1st, an arrest warrant was issued by the

18   South Boston District Court charging Plomaritis with the

19   bank robberies.  On March 1st, the state probation

20   officer informed the FBI that she had learned that

21   Mr. Plomaritis had recently checked into the High Point

22   Treatment Center in Brockton a few days earlier.

23         On March 3rd, members of the FBI Violent Crime

24   Task Force and the Brockton police arrested

25   Mr. Plomaritis at the High point Treatment Center.

1    After being advised of his rights, Mr. Plomaritis did

2    not make a statement.

3         And that would be a summary of the government's

4    evidence.

5         THE COURT:  Did you hear what Mr. Shine had to

6    say?

7         THE DEFENDANT:  I did.

8         THE COURT:  Do you understand these things?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Are they all true?

11        THE DEFENDANT:  Yes.

12        THE COURT:  So as I understand it then, you're

13   prepared to plead guilty to these three counts of bank

14   robbery because in fact you are guilty and you'd just

15   assume face up to it and get on with it, is that right?

16        THE DEFENDANT:  Yes.

17        THE COURT:  All right.  I find that Mr. Jarrod

18   Plomaritis, knowingly, intelligently, and voluntarily

19   exercises his right to plead guilty and the Clerk may

20   accept the plea.

21        Now, this is all serious, but this is the most

22   serious part.  She's going to ask you, "You previously

23   pleaded not guilty, do you want to change your plea from

24   not guilty to guilty?  If you want to change your plea

25   from not guilty to guilty, you say "Yes."  If you say

1    "No," we'll stop, we'll get your case ready for trial.

2    If you say "Yes," she'll ask you, in the proper form,

3    "How do you wish to plead, guilty or not guilty?"  If

4    you say "guilty," then you are guilty, there's no taking

5    it back or starting over.

6         Do you understand?

7         THE DEFENDANT:  I do.

8         THE COURT:  The Clerk may accept the plea.

9         THE CLERK:  Mr. Plomaritis, you have previously

10   pled not guilty to a three-count indictment charging you

11   with bank robbery, all in violation of Title 18, United

12   States Code Section 2113(a).  Do you now wish to change

13   your plea, "Yes" or "No"?

14        THE DEFENDANT:  I do.

15        THE CLERK:  How do you now plead to Counts 1

16   through 3, "guilty" or "not guilty"?

17        THE DEFENDANT:  Guilty.

18        THE COURT:  You may step down.  Thank you.

19        (Defendant steps down.)

20        THE COURT:  Now, Ms. Thrall, you have moved for

21   this -- well, Mr. Plomaritis has moved for this pre-plea

22   presentence report, and I have it, and when I inquired

23   of Mr. Shine he says he has no objection to going right

24   to sentencing, but why is this an appropriate way to

25   proceed from your point of view?

1      MS. THRALL:  From my perspective, your Honor, in

2  light of the fact that we don't have an objection to the

3  guideline calculation, really the additional information

4  that I want the Court to consider is purely from the

5  perspective of an appropriate sentence.  So for that

6  reason I don't think it's necessary to delay any further

7  any more action on a guideline calculation, for example.

8      Additionally Mr. Plomaritis has been at Plymouth

9  County House of Correction while he's been awaiting

10  trial on this case and we have had a lot of issues

11  regulating his medication, getting him appropriate

12  treatment, and in light of his significant mental health

13  history I think it's appropriate to get him someplace

14  where he can be treated as quickly as possible.

15      THE COURT:  Let me take a moment here.  (Pause.)

16  I've just answered my own question.  And having answered

17  that question and recognizing that he's being held at

18  Wyatt, um, without objection of the government, it seems

19  to make sense to proceed directly to the imposition of a

20  sentence.

21      The Court proceeds in four steps.  To impose a

22  sentence under 18 United States Code Section 3553(a),

23  the first step is to calculate the highest sentence

24  which, as this Court reads the Constitution, in light of

25  the sentencing guidelines, it could impose, given the

facts of these three offenses, as Mr. Shine has

correctly calculated, and this Court independently

calculates that that is a sentence of 105 months.  I do

award the three levels for his sparing the government

the burden and expense of a trial and in that respect

what we have here is three offenses, each offense of --

a base offense of 20, a two-level increase on each of

the offenses to 22, and that, under the grouping

calculations, gives us three points, which takes us up

from 22 to 25.  I go down three points because he's

spared the government the burden and expense of a trial,

it takes us back to 22.  His criminal history is 4.  And

that gives us a guideline range of not less than 63 nor

more than 78 months.

This Court, as part of sentencing, also looks at

the average sentences imposed for offenses of this sort.

The Court does not sentence from any average, but the

Court looks at the average in order to see what weight

to be given to the guideline framework.

In this case, nation-wide at criminal history

category 4, the average sentence for robbery is, um, 75

months, taken from the publicly-available database of

the sentencing commission.  In the First Circuit the

average sentence for robbery with a criminal history

category 4 is 69 months.  And in the District of

1   Massachusetts the average sentence for robbery with this

2   criminal history category is 71 months.

3          Now, I've calculated the guidelines -- well, let

4   me just be clear.

5          Mr. Shine, you think the guidelines are properly

6   calculated?

7          MR. SHINE:  I do, your Honor, I agree with

8   probation's assessment.

9          THE COURT:  Ms. Thrall, do you agree with the

10  calculation?

11         MS. THRALL:  Yes, your Honor.

12         THE COURT:  All right.  Now we move to the fourth

13  and most important part and that is to hear counsel.

14  Mr. Shine, I've heard you, but I'll certainly hear you

15  amplify on it, and then we'll move to Ms. Thrall, and

16  I'll hear from Mr. Plomaritis if he wishes to be heard

17  from.

18         Mr. Shine.

19         MR. SHINE:  Your Honor, I won't belabor the point,

20  the government believes in this case the low end of the

21  advisory guidelines is an appropriate recommendation,

22  therefore I'm asking for a period of imprisonment of 63

23  months, um, restitution in the amount of $5,162, 3 years

24  of supervised release to follow, and a mandatory $300

25  special assessment.

1          Reviewing Mr. Plomaritis's criminal history the

2     Court would note that he has convictions in 2009 for

3     assault and battery, where he served one year, in 2009

4     for possession of a firearm, 18 months, and in 2014, a

5     larceny charge out of the Boston Municipal Court where

6     he received a sentence of probation, and that sentence

7     was imposed within a year of the imposition of this,

8     which gives him an extra two points on his criminal

9     history, so it sort of skews his numbers somewhat, but

10    nevertheless he was on probation, it was a shoplifting

11    incident where he had $300 or $400 worth of materials in

12    a Lord & Taylors and he was leaving.

13         We believe that the period of imprisonment is

14    appropriate.  He clearly -- he seems like -- I saw him a

15    year ago, I don't recognize him, he looks terrific, I

16    will tell you up front, um, clearly the drugs are out of

17    his system at this point and he seems to be going in a

18    positive direction and I'm very happy with that.  And

19    one of the reasons I wanted to move this case along, and

20    I agreed with Mr. Thrall, is just that, that, you know,

21    we sort of are judging people where we see them today

22    and I kind of like to look at the direction I think he

23    is heading in, and I think without the drugs and the

24    influence of the drugs on him, this is a young man with

25    a lot of potential, unfortunately this young man has his

1    history and the history is what's going to keep him.

2         I read the PSR, it looks like he's a skilled

3    carpenter, he's got some cooking skills, and he's got

4    some potential.  He's not stupid, he's educated, he's

5    got a lot of potential once he gets this stuff out of

6    his system and he gets into a positive place.

7         I think an opportunity to be in jail will give him

8    a good chance to be educated -- to further that

9    education, to work on getting a further degree, perhaps

10   to get other kinds of training which will get him out of

11   the loop or the activity that he got himself into which

12   caused all the problems.  Other than a few jobs, it

13   doesn't look like he's had a really strong history of

14   work and perhaps with some sort of training and his

15   education and his willingness to do that, it will put

16   him in a better place, being with better people, and

17   those people will keep him on the straight and narrow.

18   I can appreciate the Court departing down somewhat and

19   would not oppose, you know, some sort of departure in

20   that manner.  Um -- enough said.  Thank you.

21        THE COURT:  Ms. Thrall.

22        MS. THRALL:  Thank you, your Honor.

23        I'm sure that the Court has had an opportunity to

24   review the materials that I've submitted, I actually

25   have an additional document that I'd like the Court to

1    take a look at but I can pass up, um, in a little bit.

2         I guess I see a lot of clients and the Court sees

3    a lot of defendants who use drugs for a recreational

4    purpose, they get high to have fun or they're out with

5    their friends using drugs and develop a drug-use habit,

6    and what's different for Mr. Plomaritis is that this

7    drug addiction is really rooted in a childhood of abuse

8    in his really failed attempts to try to, um, medicate

9    himself, and the treatment that he receives dates back

10   many many many years.

11        His mother, who's present in the courtroom, with

12   other family members, has been trying and trying to get

13   him on to a successful course of treatment, to have a

14   diagnosis that really takes into consideration all of

15   the very serious issues that he's dealing with, and he

16   has just been unable to find that right balance of, I

17   think, talk therapy, medication, and employment --

18   fulfilling employment or a fulfilling course of

19   education, and when he has had these opportunities

20   during these periods of sobriety, when he's at Bunker

21   Hill Community College, when he's working for his

22   brother, Evan, he has, like Mr. Shine is saying, so much

23   potential and so much to offer to his family and to the

24   community.  And what I hope for him is to be able to

25   find that appropriate balance of rewarding education and

1    work and therapeutic treatment and medication.

2         And the times in which he has really succeeded

3    have been when he's been in an incredibly-structured

4    environment, when he was at the Timber Ridge outdoor

5    program, when he was at the Provo Canyon School in Utah,

6    these are very structured, ridged environments and he

7    did well there, he did very well, and it's when he has

8    come out of those environments that he has been a little

9    bit lost and not been able to fully deal with the heavy

10   weight of this history of trauma that he carries with

11   him.

12        I'm hopeful that while he's on supervised release,

13   that the probation department can provide that level of

14   structure that he's received previously and succeeded

15   with, where Mr. Shine and I disagree is the appropriate

16   period of punishment between now and when he's getting

17   that treatment and that supervision.  And the reason

18   that I'm asking for a less severe period of

19   incarceration, for a 36-month sentence instead of a

20   63-month sentence, is so that, um, everything that has

21   happened to him in his history can be accounted for, not

22   as an excuse but as an explanation for how we find

23   ourselves sitting here in a federal courtroom.

24        When I first met Mr. Plomaritis we had a, um -- we

25   had a detention hearing and he was interviewed by

1    pretrial services and during the interview with pretrial

2    services he talked about his, um, history of abuse with

3    his father, he talked about how difficult his childhood

4    was, how difficult it was to get his bipolar diagnosed,

5    but he did not talk about the incident in the North

6    Carolina jail that is outlined in the PSR, he didn't

7    mention it, and I think that that's significant.

8         I walked out of that pretrial services interview

9    and I said to myself, "What happened to this young man?"

10   because it was so clear to me in that moment that he had

11   experienced something besides what he had just disclosed

12   to pretrial services separate from what was going on

13   with his father, that there was something else out

14   there.  I contacted his mother and I said almost exactly

15   that, "What happened to him?" and she's the one who told

16   me about what happened in the jail, not him, and I think

17   that that's also important.

18        This is -- he's not a young man who's looking at

19   this one and trying to excuse his actions.  He didn't

20   even raise this with me.  He can't speak about it.

21   That's why I think the medical records that I provided

22   from the North Carolina hospital that confirm that this

23   happened are particularly relevant and important.  This

24   is not made up to try to get a lesser sentence, this is

25   a very very severe traumatic incident that, from my

1    perspective, um, warrants consideration in sentencing

2    here today.  Because without all of these combined

3    issues, that trauma, the history of abuse with his

4    father, the bipolar diagnosis, without all of these

5    things I don't believe that we would be here today.

6         He has so much potential and such a tremendous

7    amount to offer to the community and to his family.  His

8    family is very very supportive of him and I have

9    provided those letters from his family, which I think

10   are pretty typical to include in a sentencing memorandum

11   but I wanted to particularly highlight the dynamics with

12   his family because I take issue with the way in which

13   the presentence report describes his relationships with

14   his mum and his sister, Marley.

15        He is not a violent person, they do not view him

16   as a violent person, they are not afraid of him.  The

17   incident that is described in the PSR between himself

18   and his sister really was at a tremendously difficult

19   point for him and his family after the loss of his

20   grandmother, it was to that maternal grandmother that he

21   could have escaped the abuse from his father and that

22   her loss really shook the family pretty deeply.  He's in

23   regular contact with his family, they are incredibly

24   loving and supportive of him.

25        The piece of evidence that I wanted the Court to

1    consider that I can pass up is the Christmas card that

2    Jarrod sent to his mom that I think speaks to his

3    relationship with his family in a way that he never

4    expected a Court to look at or consider.

5           (Passes up to judge.)

6           THE COURT:  This is this last Christmas?

7           MS. THRALL:  Yes.

8           THE COURT:  Thank you.

9           MS. THRALL:  Thank you.

10          I wanted to speak for a moment about the crimes

11   themselves.  These are obviously very very serious

12   crimes, very serious offenses and he feels tremendously

13   bad about committing them.  I wanted the Court to

14   consider that in each of the notes that's passed to the

15   bank tellers, that he does not ever threaten violence,

16   he does not ever threaten that he has weapon, he

17   absolutely feels terrible for putting these bank tellers

18   in fear and for affecting their daily life in that way.

19          THE COURT:  That you recognize.  I listened

20   carefully to Mr. Shine's recitation, but of course that

21   element of the crime is fully satisfied.

22          MS. THRALL:  Absolutely.  Absolutely.

23          THE COURT:  Go ahead.

24          MS. THRALL:  I wanted the Court to sort of

25   consider where Mr. Plomaritis is in his life at the time

1    that these three crimes are committed and they're

2    committed in sort of short succession with each other in

3    January and in February, and after, um, the crimes are

4    committed Mr. Plomaritis is arrested and he is arrested

5    at the High Point Treatment Center, the High Point Drug

6    Treatment Center in Brockton and that is why I included

7    those High Point treatment records with my sentencing

8    memo because it demonstrates not only that he's been

9    there many many many times before, but that he's

10   actually in treatment after these offenses are

11   committed, and I think that that speaks to the length at

12   which he's trying to go to change his life.  I can't

13   count how many times he has been in treatment, it is

14   astounding.

15        And another issue that I took with the presentence

16   report and I think this is also reflected in the High

17   Point treatment records, is many many many times he does

18   what's called a "Voluntary Section 35," he voluntarily

19   commits himself many times over the course of years to

20   treatment into Bridgewater because he's trying to get

21   better, because he wants to graduate from college and he

22   wants to work in carpentry, he wants to better himself,

23   he does not want the life that he's currently living,

24   and the fact that a major factor in why we're here where

25   we are is a medical diagnosis that he can't control and

1  that was not in any way self-inflicted, that I think

2  should be a factor in designating the appropriate

3  sentence.  He needs treatment and he's not going to find

4  the full breathe of that treatment in a federal prison.

5  THE COURT:  Well, he's not going to find it in

6  Wyatt, which is the reason for acting promptly.

7  What about the 500-hour drug treatment program,

8  are you asking for that?

9  MS. THRALL:  Absolutely.  Absolutely.  I think

10  that that's completely appropriate and will help him

11  immensely.  But in order for him to fully realize his

12  potential, he needs to be in treatment in the community

13  and not necessarily in a federal prison, and that's

14  another reason I'm asking that the Court sentence him to

15  36 months instead of the 63 months that Mr. Shine is

16  requesting.

17  I think in your conversation with him just today

18  you can see how much he's struggling, um, with these

19  mental health issues, he is thinking clearly, but he

20  needs help and I want to get him closer to that help

21  sooner rather than later, I think that that's going to

22  just ensure a better successful rehabilitation for him.

23  And a 36-month period of incarceration is certainly

24  punishment enough for these crimes.

25  THE COURT:  Thank you.

```
 1        MS. THRALL:  Thank you.  And Mr. Plomaritis does
 2   want to address the Court.
 3        THE COURT:  Yes, that's your right, sir, you have
 4   the right to talk to me directly.  Now you don't have
 5   to, but as your attorney said, if you want to, I will
 6   hear you now.
 7        THE DEFENDANT:  Um, I wrote this down because it's
 8   very difficult for me to speak.
 9        THE COURT:  And that's fine.
10        THE DEFENDANT:  Just this is to whom it may
11   concern, um, mainly to your Honor.
12        I'd just like to say how deeply sorry I am for
13   what I've done, the decisions that I've made, um,
14   there's not a moment that goes by that I don't regret
15   it.  I always think about how the victims might feel,
16   how they would be at home with their families.  How they
17   come home at the end of the day and, you know -- you
18   know, their families asking them how their day was and,
19   you know, they say, "Someone robbed the bank today," and
20   I can only imagine how that affects their families
21   constantly worried about their loved ones, and all
22   they're trying to do is enjoy life.  All they're trying
23   to do is enjoy life and that's what bothers me most, um,
24   I took that peace of mind away from them and, um, that's
25   just not who I am as a person.  It's just not.  And I
```

1  rob these banks to feed my addiction and mask my mental

2  health.

3      The first one I got away with and I thought to

4  myself, "That was easy, I could keep doing this," and,

5  um, deep down inside, um, you know, I, um -- it's

6  killing me to hurt others and destroy my life and, um,

7  towards the end of the using the drugs just -- they

8  weren't masking my mental illness, they weren't, and I

9  was miserable, so I decided to check myself into the

10 High Point treatment center because, you know, I just

11 wanted to live a clean and healthy life and have a

12 family, that is when I decided to check into High Point.

13 And, um, they detoxed me and referred me to the CSS

14 program next door and where I could get counseling for

15 mental health and addiction and also find the proper

16 medication.  And I participated in treatment until I was

17 arrested for the current offense.

18     Growing up wasn't easy for me.  I was born with

19 bipolar and, um, you know, due to my upbringing I

20 developed PTSD.  I grew up in a very physically and

21 emotional household from -- due to my father, who I do

22 not have a relationship with.  And, um, you know, just

23 to give you an example, I hated, you know, driving home

24 from school with my family -- not my father, turning the

25 corner and seeing his car there, um, that was like, um,

1  everyone's eyes were full of fear after that, everything

2  got quiet, and, um, you know, my mother ended up leaving

3  him due to the abuse.  And, um, give me a minute please.

4          THE COURT:  Of course.

5          (Pause.)

6          THE DEFENDANT:  And, you know, we've always been

7  close, my mother and I.  She knows how hard it is for

8  me, along with my brothers and sister, um, who I'm proud

9  of by the way, um, we stick together because we

10  understand each other's struggles.  I have struggled so

11  hard with my mental health for so long, it is so hard to

12  get a, um, proper diagnosis.

13          I was first diagnosed at McLean Hospital at 13

14  years old.  So much has changed since then.  You know, I

15  struggled to find out what would work for me.  And at

16  the end I -- I ended up turning to drugs because, um,

17  before I'm able to find the proper treatment I will get

18  into a manic state where I can't, um, slow my thinking

19  down and begin to make rational decisions, that at times

20  I have so much depression that I can't even leave the

21  house and when I do I feel like I can't breathe, um, and

22  I start to panic.  To do drugs it would cover that up

23  and, um, for a short period of time, yet I still seek

24  treatment and I will never give up.  I won't.

25          I want to be able to go back to school.  You know,

um, I am currently educating myself on trading
currencies with books and, um, guidance from a friend
when I can get in touch with him.  I also want to begin
working with my brother, he's a great business partner,
um, when it comes to real estate development.  I just
know none of this is possible unless I take care of my
mental health and my addiction.

I -- sometimes I need help and, um, I need some
serious help and I want to take advantage of this time
to get help, I mean this could be an opportunity, you
know, and, um, I'm just tired of hurting others and
letting family down.  I just want to begin to live life.
All I've been doing is existing.

I would like to, um, just thank my family for
their support and, um, always being understanding.  I
would also like to thank you, your Honor, for letting me
express my insight, just on the situation I'm in, and
this is coming from me and this is how I feel.  Thank
you.

THE COURT:  Thank you.

Mr. Jarrod Plomaritis, in consideration of the
offenses of which you stand convicted, the information
from the United States Attorney, your attorney, the
probation officer and yourself, this Court sentences you
to 4 years in the custody of the United States Attorney

1   General.  You'll have credit toward the service of that

2   sentence from April 23rd, 2015 when you were taken into

3   federal custody.

4        The Court thereafter imposes upon you 3 years of

5   supervised release with all the standard conditions of

6   supervised release and the following special conditions,

7   that you shall not possess a firearm or other dangerous

8   weapon, that you will participate in a program for

9   substance abuse counseling not to exceed 104 drug tests

10  per year, that you'll participate in a program for

11  mental health counseling as directed by the probation

12  office, and that you participate in the probation office

13  Anger Management program.

14       The Court imposes upon you restitution in the

15  amount of $5,164.00 of which $3,447.00 be paid to

16  Eastern Bank and $1,715.00 be paid to Santander Bank.

17  The Court imposes upon you the $300 special assessment

18  required by the law as well as forfeiture as sought in

19  the indictment.

20       Let me explain this sentence to you.  The simple

21  fact, sir, is that you have been a real danger to the

22  community.  These are three different bank robberies,

23  they were committed while you were on a period of

24  probation from another court that took a chance on you.

25  Now that said, and if you listen, if you listen to what

1    usually people get, it's in the 70 and 80-month range.

2         Now in your case the government has very

3    sensitively taken into account the childhood abuse and

4    the deep-seeded nature of your addiction, and that

5    addiction, of course, and you recognize this, addiction

6    can't excuse this, the primary goal that the Court must

7    follow is to protect all the people and the secondary

8    goal, almost as important, is to do the best I can for

9    you and the best I can for you is a sentence of this

10   nature.  This is a fair and a just sentence and it

11   reflects the seriousness of the crimes.

12        I do recommend that you be accepted into the

13   500-hour drug treatment program and I will consider,

14   once you're out, recommending that you be a candidate

15   for the Restart Program in this court during your period

16   of supervised release.

17        Now, I recognize what your capabilities are, you

18   have the capacity -- first of all and most important,

19   you have a family that truly loves you and sees in you

20   the good and the good person you can be and you have the

21   capacity to make a real contribution to society.  What

22   I've put in place gives you a chance to do that and

23   nevertheless recognizes the seriousness of the crimes

24   which you stand convicted.  That's the sentence of the

25   Court.

1          You have the right to appeal from any findings or

2     rulings the Court has made against you.  Should you

3     appeal and should your appeal be successful in whole or

4     in part and the case remanded, you'll be resentenced

5     before another judge.  Ms. Thrall, if an appeal is

6     decided upon, you want transcript, seek it from this

7     session of the Court because I'll turn it around right

8     away.

9          Do you understand?

10          MS. THRALL:  I do.  Thank you.

11          THE COURT:  Very well.  He's remanded to the

12     custody of the marshals.  Thank you.

13          MS. THRALL:  Your Honor, there is one issue?

14          THE COURT:  Yes.

15          MS. THRALL:  He was arrested on this case on March

16     3rd and his cases were pending in the South Boston

17     District Court --

18          THE COURT:  He should have credit from the 3rd --

19          MS. THRALL:  March 3rd.

20          THE COURT:  Well, that's your position.

21          The government agrees, because they're related

22     charges?

23          MR. SHINE:  Yes, your Honor.

24          THE COURT:  Very well.

25          MS. THRALL:  Thank you, your Honor.

1          THE COURT:  He will have credit toward the service

2    of this sentence from the 3rd of March 2015 to the

3    present.  Thank you.

4          MS. THRALL:  Thank you.

5          THE COURT:  Thank you.

6          MR. SHINE:  Your Honor, thank you very much.

7          THE COURT:  We'll call the next case.

8          (Ends, 3:00 p.m.)

9

10              C E R T I F I C A T E

11

12          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

13    hereby certify that the forgoing transcript of the

14    record is a true and accurate transcription of my

15    stenographic notes, before Judge William G. Young, on

16    Monday, February 1, 2016, to the best of my skill and

17    ability.

18

19
      /s/ Richard H. Romanow 04-01-16
20    _____
      RICHARD H. ROMANOW  Date
21

22

23

24

25